Filed 1/20/23

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. BENJAMIN GONZALEZ et al., Defendants and Appellants. | B315921 (Los Angeles County Super. Ct. No. NA072648) |

APPEAL from orders of the Superior Court for the County of Los Angeles, Tomson T. Ong, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Benjamin Gonzalez.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant Gilbert Gomez.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant Gerson Bazan.

---

[*]     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication except for Discussion Part A.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

## I.     INTRODUCTION

Defendants Benjamin Gonzalez, Gilbert Gomez, and Gerson Bazan appeal from the trial court's denial of their Penal Code section 1172.6[1] petitions for resentencing on their first degree murder convictions.[2]  Gonzalez contends the court erroneously denied his petition at the prima facie stage without issuing an order to show cause and holding an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3).  Gomez contends the court erred in denying his petition without reducing his first degree murder conviction to second degree murder because the court did not find he satisfied the elements of deliberate and premeditated first degree murder.  Gerson and Gonzalez join Gomez's contention.  We affirm.

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.  Defendants filed their petitions pursuant to former section 1170.95.  Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)  We will refer to the statute by its current section number only.

[2]     The jury also convicted Spencer Bazan, Gerson Bazan's brother, of first degree murder.  We will refer to Spencer, who is not a party to this appeal, and Gerson Bazan by their first names to avoid confusion.

2

## II. FACTUAL BACKGROUND

The following factual background is from a prior nonpublished opinion from a different panel of this division, *People v. Gonzalez* (Feb. 10, 2010, B211559) [nonpub. opn.])[3]:

"On November 20, 2006, 14-year-old Geovonie Taylor was living with his cousins, Michael and Norman Cox, who were 16 and 18 years old.  After school that day, Taylor met the Cox brothers at a friend's house.  It was nighttime when they left the friend's house and decided to walk home.  None of them was armed.  They walked down Anaheim Street and began to turn down Gundry Avenue, near a construction site.  There were three Hispanic males across the street, along with two Hispanic females.  Taylor heard the males call out repeatedly, 'Eastside Longos,' 'fuck [racial slur],' 'F Insane,'[4] and 'F 20.'  Taylor knew that Eastside Longos, the 20's, and Insane were all gangs.  He understood them to be making gang threats.  Taylor was wearing his school uniform, which included a burgundy colored shirt.

---

[3]    On our own motion, we take judicial notice of the prior nonpublished opinion as well as the underlying trial record in that appeal.  We also take judicial notice of the subsequent nonpublished opinion in this case, *People v. Gonzalez* (Nov. 30, 2020, B300650).)  Accordingly, we deny as moot Gonzalez's request for judicial notice of the prior opinion and certain portions of the trial record.

[4]    "Detective Malcolm Evans of the City of Long Beach Police Department testified that 'Baby Insane is a clique of the Insane Crips criminal street gang.'  The gang is reputed to be violent.

Norman wore red and blue sweat pants, a black long-sleeved shirt, and a red and white baseball cap with 'Big Baby' on it.[5]

"Taylor and the Cox brothers continued to walk, but they could not continue down Anaheim because their path was blocked by the construction site gates—so they turned left onto Gundry. As they did so, the Hispanic males ran across the street toward them, calling out gang names, 'F [racial slur]' and 'Eastside Longos.' There appeared to be five males in all. The Hispanic males asked where they were from, which Taylor understood as asking for their gang affiliation.[6] Neither Taylor nor the Cox brothers responded. In the meantime, the Hispanic males surrounded them as they tried to back away. One of the Hispanic males approached them, while making a gang threat; another reached for something from his back, near his hip. Norman pushed Taylor and Michael back and faced the Hispanic males, who surrounded him.

"One of the Hispanic males ran up to Norman and 'socked him in the head.' Norman tried to escape, but slipped and fell. While Norman was on the ground, the Hispanic males repeatedly kicked and punched Norman all over his body. Norman curled up and tried to fend off the blows. Taylor was too afraid to help his cousin. When another of the male Hispanics approached, Taylor and Michael said they 'did not bang,' and they were left alone.

---

[5] "Members of Baby Insane typically have 'BIG,' 'BABY,' or 'B' on their red hats.

[6] "Detective Evans testified that the question 'where are you from' can mean a challenge to identify one's gang affiliation or a challenge to fight.

Taylor heard Norman say, 'Please don't stab me.' There were four Hispanic males around Norman at the time. Although Taylor did not see any of the attackers holding a weapon, he saw one of them making stabbing motions at the time Norman cried out. Norman did not fight back; he was not armed. The Hispanic males ran away when Taylor yelled and ran toward them.

"Taylor saw Norman was bleeding from his mouth, so he ran to the park where a dance was going on and asked for help. The paramedics and police arrived approximately 15 minutes later. Norman had suffered eight stab wounds, including a fatal wound to the left side of his chest that penetrated the lung. Other wounds appeared to be defensive in nature. The stabbing instrument that was used had one blunt edge and one sharp edge. It could not be determined whether there were multiple instruments used. At trial, Taylor identified Gonzalez and Gerson as attackers. From a photographic six-pack lineup, Taylor identified Gonzalez as the one who stomped on Norman and punched his ribs. At the preliminary hearing, Taylor identified Gonzalez, along with Spencer and Gerson. He was not sure about his identification of Gomez.

"Seleta Castillo lived on Hoffman Avenue, a block away from Gundry. That night, she was walking home from work along Gundry. At the intersection of Gundry and Anaheim, she saw four or five male Hispanics, which included defendants, and two female Hispanics across the street. She had previously seen defendants in the neighborhood and in her apartment complex, and she had also seen the two females holding hands with Gonzalez and Gerson. As Castillo walked home, she saw some African-American males walking down Anaheim. Defendants called out their gang affiliation and told the African-Americans

5

they were not supposed to be there—it was not their 'turf.' They repeatedly demanded to know what the African-Americans were doing in their neighborhood. Gonzalez called out, '[racial slur].' The African-Americans did not respond.

"Defendants approached the African-Americans, who were turning down Gundry. Norman said, 'I don't want no problems' and put his hands up. There was nothing in his hands. Defendants surrounded him and passed a weapon amongst themselves. Defendants began to strike and kick Norman. They continued to beat Norman after he had fallen to the ground. Afterwards, they ran away to Hoffman Avenue. Castillo walked past defendants during the course of the attack. At no time during the incident did the African-Americans say anything hostile or antagonistic to defendants.

"Castillo went home, but was too frightened to call the police. Defendants had seen her and knew where she lived. She feared that she or her family would be in danger if she did. When the police subsequently contacted her at work, she identified Gonzalez by name and identified all four defendants' photographs. After the incident, Castillo saw Gonzalez's sister on the bus, who mumbled something to her in a threatening manner and said she would 'get' Castillo's daughter.[7] That made Castillo afraid to testify. She received financial assistance from Los Angeles County to help her move to a different neighborhood.

"Officer Vuong Nguyen of the City of Long Beach Police Department was on patrol in Long Beach at 9:00 p.m. He and his partner responded to a stabbing incident on Gundry and

---

[7] "The trial court instructed the jury that Castillo's testimony was being offered solely as to Gonzalez.

Anaheim.  He found Norman on the ground, bleeding.  The area was fairly well illuminated by streetlights.  There was a red hat lying next to Norman's body.

"Eva Ramirez was Gonzalez's girlfriend at the time of the incident.  Gonzalez told her that he was a member of 'NKS,' but Ramirez was not sure whether it was a street gang.  Spencer told her that he was a member of the Eastside Longos.  Ramirez was afraid to testify because of 'the consequences,' which included risk to the safety of her family.  She was also acquainted with the other three defendants for some months.  As such, she knew Gerson's girlfriend, Nancy Ascencio, who lived with the Bazan brothers on Hoffman.

"Ramirez saw the stabbing incident.  That morning, she, Ascencio, and another female visited Spencer.  Toward the end of the day, Gomez and Gonzalez joined them.  It was dark outside when they all left together to go to the nearby park.  They walked back on Gundry.  A young female Ramirez did not know came up and spoke with Gomez.  A young male named Marcos joined them too; Gerson was not present.  Three African-Americans were walking across the street from them.  She heard them say something.  At some point, she heard someone twice yell, 'This is Insane Crips,' which she understood as a gang challenge.  She looked over and saw an African-American male wearing a red hat, which she believed was a gang color.  Gonzalez, Gomez, Spencer, and Marcos ran across the street to confront the African-Americans.  She heard one of them swear at the African-Americans; she also heard one of them say Eastside Longos.  Gonzalez, Gomez, and Spencer fought one of the African-Americans.  Ramirez did not see them use any weapon.  Marcos did not take part; he was standing with the two African-

7

Americans who were not fighting. Gonzalez, Gomez, and Spencer ran back across the street, leaving the victim on the ground, before running back to the apartment complex on Hoffman.

"A few weeks after the incident, Gonzalez told Ramirez that the victim had died and whichever one of them was first arrested 'would take the blame.'[8] Gonzalez telephoned her from jail after his arrest. In the conversation, Gonzalez told Ramirez to say that she was with him at his house at the time of the incident and to arrange an alibi with his sister Andrea.[9] Gonzalez got a 'Long Beach' tattoo on his forehead while in custody. She knew Gonzalez by the nickname 'Ceenoe'; Gomez by 'Muneco'; Spencer by 'Minor'; and Gerson by 'Sonick.'

"Marcos Robles, 15 years old at the time of the incident, was acquainted with Gonzalez and Gomez. Robles testified pursuant to an agreement immunizing him from prosecution. He was present at the stabbing scene. He ran away with a group of ten persons toward Hoffman. He denied telling the police that he saw defendants running across the street and joined them. An audiotape of his interview with police was played to the jury. He was afraid of testifying against defendants because he feared violent retribution.

"In February 2007, Kwanna Childress received a letter in the mail. The envelope indicated that it was sent by Gerson and addressed to 'Elizabeth Nancy' on Hoffman Avenue. Childress opened the envelope without looking at the address, however,

---

[8]  "This testimony was admitted solely against Gonzalez.

[9]  "Ramirez later received a threatening message on her 'Myspace' page from Andrea.

assuming it was addressed to her.  The evidence concerning the letter was admitted solely as to Gerson.  One line in the letter stated, 'Remember you are also a suspect in the murder on Gundry.'  It was signed by 'Sonick' with the letter 'c' crossed out.  She took the letter to the police.  Detective Daniel Mendoza testified that the letter contained the word 'Longeros,' which is a reference to the Eastside Longos.  It also contained the letters 'M.D.S.,' which members of that gang used to refer to their sect as the 'Malditos.'  There was also a reference to someone called 'Massive,' who was a member of the Eastside Longos.

"Spanish language interpreter Alfred Calderon translated portions of the letter, which referred to Ascencio as a 'bitch' and a 'whore.'  The writer was angry with her because she had disobeyed his request to stay away from 'every Longero, especially from the M.D.S.'  It also contained a threat that 'Massive' would 'fuck [her] up.'  The letter went on to say that 'the Big Homey' said he needed the money owed by 'G Strap' and 'Acid' by March 14 'because of the business they were doing.'  He advised her not to leave her house 'because if the police get [her], that's all on [her].'  She must 'stay away from everyone' because the Eastside 'Longos got the green light.'

"Detective Malcolm Evans testified that defendants lived in apartments on Hoffman, close to each other and the murder scene.  Detective Evans interviewed Spencer on the day of his arrest.  After advising Spencer of his Miranda rights,[10] Spencer waived those rights and agreed to speak to the detective.  Initially, Spencer denied any knowledge of Norman's stabbing.  The audiotape of the interview was played to the jury, subject to

---

[10]     "*Miranda v. Arizona* (1966) 384 U.S. 436.

9

the instruction that the evidence was admissible solely against Spencer. In his statement, Spencer admitted stabbing the victim, but explained that he did it in self-defense. One of the African-American males first approached Spencer and made a gang challenge. When Spencer said he was 'from Longo,' the African-Americans made more threats. The 'main guy'—apparently, Norman—ran at Spencer and knocked him down. Spencer saw the others begin to run toward him. Fortuitously at the moment Spencer fell, he found a screwdriver lying on the ground, which he used repeatedly to stab his victim. Detective Evans participated in a search of the Bazan residence. Two screwdrivers and a knife were found in his bedroom.

"Officer Miguel Rosales testified that Gonzalez had admitted being a member of a 'tag banger crew' called 'NKS,' or 'Nip Killing Squad.' His gang moniker was 'C-Note.' Officer Rosales understood that Gonzalez had subsequently been 'jumped into' the Eastside Longos, which was a full-fledged criminal street gang. Gomez had admitted to membership in the Eastside Longos. Both Spencer and Gerson had admitted being members of the Eastside Longos. The stabbing scene was inside Eastside Longos territory. Baby Insane, a violent clique of the Insane Crip gang, claim all of Long Beach as their territory and are enemies of the Eastside Longos. The hat worn by Norman is consistent with Baby Insane membership.[11]

---

[11] "Detective Carlos Grimaldo testified that Gomez admitted Eastside Longo membership, as did Spencer. If a person yells out, 'This is Baby Insane' in the streets, it is likely to be meant as a gang challenge.

"Detective Hector Gutierrez was the prosecution's gang expert. He was familiar with the Eastside Longos gang, having investigated it for 18 years. At the time of Norman's murder, the gang numbered approximately 1100 members. The location of the stabbing was within territory claimed by Eastside Longo. He testified as to predicate crimes committed by other Eastside Longos. 'M.D.S.' or 'Malditos' was an Eastside Longo clique. The Eastside Longos are in conflict with African-Americans. Violent confrontations with African-Americans are likely to be fatal due to the Eastside Longos' 'mindset.' Within the Eastside Longos, it is understood that a member will enhance his reputation in the gang by committing increasingly violent crimes. Eastside Longo members will tend to be armed in their own territory because rival gangs claim portions of territory within that claimed by the Eastside Longos.

"Gerson is also a self-admitted Eastside Longo, with a gang-related tattoo on his arm. He also has the letters 'SUR' tattooed on his chest, which is significant for prison purposes because northern and southern California gang members are enemies in prison. Gerson's gang moniker is 'Sonick.' Most Hispanic gangs are related to the Mexican Mafia, which is a prison gang. The phrase 'green light' means that 'it is open season on your gang because you're not obeying by the Mexican Mafia rules.'[12] Spencer is a self-admitted Eastside Longo with the monikers 'Minor' and 'Crow.' Gomez is a self-admitted Eastside Longo, with the moniker 'Little Muneco.' Gonzalez is also a self-admitted Eastside Longo, who was previously associated with NKS, which is a tagging crew.

---

[12] "This testimony was admitted only as to Gerson.

11

"As to Gerson's letter to Ascencio, Detective Gutierrez opined that it was signed with his gang moniker and referred to 'Massive,' who was also a member of that gang. The letter also uses the term 'Longero,' which means Eastside Longo. An Eastside Longo member will typically cross out the letter 'c,' as was done in 'Sonick's' signature, because 'c' stands for the gang's rivals, the Crips. Eastside Longos are hostile towards African-Americans and Asian-Americans because those ethnic groups comprise the membership of Crip gangs.

"After listening to a hypothetical set of facts consistent with the prosecution case, Detective Gutierrez opined that Norman's stabbing would have been committed to benefit the Eastside Longos. The Eastside Longos 'have problems with African-Americans.' The Eastside Longos often commit violent crimes, and their reputation within the gang is enhanced by doing so. Further, commission of violent offenses serves as a warning to rivals and to community members. The former will be less likely to attack Eastside Longos and the latter will be less likely to report Eastside Longos for committing crimes. Within the gang's culture, it is understood that those who 'snitch' against gang members will suffer violent retribution. Civilians, as well as gang members, understand this. As a result, many witnesses are afraid to testify against gang members, which inures to the benefit of the gang, allowing its members to commit crimes with impunity.

"If an African-American male wearing a red cap with 'Big Baby' on it yelled out 'This is Baby Insane,' it would be understood as a gang challenge from a gang with a reputation for violence.

"**Defense Case**

"Gonzalez rested without presenting any evidence.

"Gomez called Detective Evans, who testified that when Gomez was arrested in May 2007, he had 12 paycheck stubs in his possession, dating from November 19, 2006, through May 6, 2007.

"Gerson called his mother, Maria De Los Angeles Lozano, who testified that her two sons lived with her in an apartment on Hoffman Avenue at the time of the incident. Marta Monzon was the building manager. Lozano arrived at her apartment from work at 4:30 p.m. and fell asleep until approximately 8:30 p.m. At that time, Monzon unlocked the apartment door for Gerson and his girlfriend, Ascencio. Neither Gerson nor Ascencio left the apartment that night. On cross-examination, Lozano testified that she awoke to see Gerson and Ascencio. After that, Lozano went to Spencer's bedroom and fell asleep until 11:30 p.m. Lozano would not have known whether they left the apartment in the meantime.

"Monzon testified that she was on duty on an evening around the time of the incident. Gerson and Ascencio asked for a key to the Bazan apartment because his mother did not answer the door. Monzon gave Gerson the key and saw him and Ascencio go upstairs toward the Bazan apartment. It was approximately 6:30 p.m. From Monzon's apartment, she could see persons entering the apartment building. At approximately 8:30 p.m., Gerson returned the key to Monzon. She went to sleep at 9:30 or 10:00 p.m.

"Gerson testified that on the day of the stabbing incident Ascencio stopped by to see him, and he told her they were going to a party that night. However, their ride did not show up, so

13

they went back to the Bazan apartment. It was approximately 8:00 p.m. He knocked on the door, but there was no answer. He did not have the apartment key, so he got a key from Monzon. He opened the door for himself and Ascencio and found his mother asleep. Within approximately 30 minutes, he went downstairs and returned the key to Monzon. He went back to the apartment and went to bed and slept there until the following day. He did not participate in an attack of an African-American male.

"While in custody following his arrest, Gerson corresponded with Ascencio. He did not author the letter referenced by Childress. 'Sonick' is not his nickname. Gerson is not associated with the Eastside Longos. His tattoos are not gang-related.

"Ascencio generally corroborated Gerson's testimony concerning the events of November 20, 2006. They spent the evening and night in the Bazan apartment and did not go outside to the location of the stabbing incident. She did not see the other defendants that night. The letter referenced by Childress was not in Gerson's writing.

"Spencer called Officer Bernardo Brajas who had responded to the stabbing incident and interviewed Taylor. Taylor did not tell the officer that prior to the stabbing, he was coming from a residence near 10th and Alamitos, as he had done at trial." (*People v. Gonzalez, supra,* B211559.)

## III.   PROCEDURAL BACKGROUND

A jury convicted defendants of first degree murder (§ 187, subd. (a)) and found true the allegation that the murder was committed for the benefit of a criminal street gang (§ 186.22,

14

subd. (b)).[13] The trial court sentenced Gomez and Gerson to 25 years to life in state prison and Gonzalez to 50 years to life in state prison under the Three Strikes law (§§ 667, 1170.12). With modifications not relevant to this appeal, a prior panel of this court affirmed defendants' convictions. (*People v. Gonzalez, supra*, B211559.)

In January 2019, defendants filed petitions for resentencing pursuant to section 1172.6.[14] The trial court appointed counsel for defendants and ordered the District Attorney to file responses to the petitions. The District Attorney filed an opposition to the petitions, arguing, in part, that Senate Bill No. 1437, former section 1170.95's enacting legislation, impermissibly amended two California voter initiatives (Propositions 7 and 115) and violated the California Constitution insofar as it purported to vacate final judgments in criminal cases. The court agreed with the District Attorney's arguments and denied the petitions. Defendants appealed, the Attorney General conceded the court erred, and we reversed and remanded the matter for further proceedings consistent with our opinion and section 1172.6. (*People v. Gonzalez, supra*, B300650.)

---

[13] The jury also convicted Spencer of first degree murder and found true the gang allegation and the allegation that he personally used a knife in the commission of the crime (§ 12022, subd. (b)(1)).

[14] Gerson filed a form petition for a writ of habeas corpus. Finding that the crux of that petition concerned "'Senate Bill [No.] 1437, Petition for Resentencing, P.C. [1172.6],'" the trial court treated the petition as a petition for resentencing. (*People v. Gonzalez* (Nov. 30, 2020, B300650) [nonpub. opn.].)

On remand, the trial court held a hearing on October 20, 2021, on defendants' petitions for resentencing. After hearing the parties' arguments for and against finding defendants guilty of murder and considering the evidence adduced at trial, the court found defendants guilty of murder as direct aiders and abettors and denied defendants' petitions for resentencing.

## IV.   DISCUSSION

### A.   *Section 1172.6, Subdivision (d)(3) Evidentiary Hearing*

Gonzalez contends the trial court erred and violated his state and federal constitutional rights to procedural due process when it denied his petition for resentencing at the prima facie stage without issuing an order to show cause and holding an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3). We disagree.

### 1.   Background

At the October 20, 2021, hearing, the trial court stated, "So I set the hearing because I find that there is sufficient showing by the defense to go forward with the hearing." The court then asked counsel for each party whether he or she had anything to add and specifically asked the prosecutor why it should not grant defendants' petitions for resentencing.

The prosecutor summarized the evidence adduced at trial that she believed showed the defendants guilty of murder under still valid theories of guilt: conspiracy to commit murder, direct perpetrators, direct aiding and abetting, and implied malice.

16

Gonzalez's counsel stated that the facts were not in dispute, but that it was not persuasive to argue those facts established a conspiracy when that theory was not charged or litigated at trial. Counsel limited his argument, stating he would join Gerson's argument.

Gomez's counsel argued the facts were in dispute. He contended that Castillo's testimony did not support the appellate court's conclusion that she testified defendants passed a weapon among themselves. Counsel argued it was the prosecution's burden to prove beyond a reasonable doubt that Gomez aided and abetted the stabbing—that burden was to prove guilt at that hearing and not to show guilt was established at the prior trial because the law had changed—and the prosecution failed to meet its burden.

Gerson's attorney first focused on the prosecutor's arguments at trial, noting that the prosecutor had argued that Spencer was the killer and Gerson was guilty under the natural and probable consequences theory of guilt and not as a conspirator. He then argued that the trial court was not permitted to consider factual assertions in the appellate court opinion as evidence and that the facts in the reporter's transcript should control. Counsel explained, "We are having a court trial right now, because the burden of proof is beyond a reasonable doubt, and you are sitting as the juror. A jury and juror." Finally, counsel recited the evidence submitted at trial and argued that evidence did not support a murder finding against his client.

The trial court, which had served as the court for defendants' trial, stated its view of the evidence. It concluded the evidence showed that defendants chased down, surrounded, and

beat Norman—thereby preventing him from escaping or defending himself—so Spencer could stab him. Thus, the court concluded, defendants were major participants and direct aiders and abettors. Accordingly, it denied defendants' petitions for resentencing.

2. Analysis

Section 1172.6 "creates a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) "If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (§ 1172.6, subd. (c).) Within 60 days of issuance of the order to show cause, the trial court shall hold an evidentiary hearing "to determine whether the petitioner is entitled to relief." (*Id.*, subds. (d)(1) & (d)(3).)

"[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless

18

the evidence is admissible pursuant to another exception to the hearsay rule.  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

As the Attorney General concedes, the trial court did not expressly issue an order to show cause.  Nevertheless, the court held the evidentiary hearing section 1172.6, subdivision (d)(3) requires.  The court explained at the outset of the October 20, 2021, hearing that it had set the hearing because defendants had made a sufficient showing to hold a hearing—i.e., that defendants had made a prima facie showing that they were entitled to relief. (§ 1172.6, subds. (c) and (d)(1) & (3).)  It then asked whether any party had anything to add.  Then, it asked the prosecutor why it should not grant defendants section 1172.6 relief.  It thus put the prosecution to its section 1172.6, subdivision (d)(3) burden of proof—at a section 1172.6, subdivision (d)(3) hearing, the prosecution has the burden of proof to show a defendant's guilt beyond a reasonable doubt.  The prosecutor responded by discussing the trial evidence she believed showed defendants were guilty of murder under a still valid theory of guilt.

Likewise, defense counsel participated in the hearing as if it was a section 1172.6, subdivision (d)(3) evidentiary hearing, arguing the trial evidence did not support a guilty finding. Moreover, when Gomez's counsel argued it was the prosecution's burden to prove beyond a reasonable doubt that Gomez aided and abetted the stabbing, Gonzalez's counsel did not object and seek clarification about the nature of the hearing.  When Gerson's counsel also contended the section 1172.6, subdivision (d)(3) beyond a reasonable doubt standard applied at the hearing, Gonzalez's counsel again remained silent.

Finally, the trial court's ruling demonstrates that it conducted a section 1172.6, subdivision (d)(3) evidentiary hearing. At the hearing's conclusion, it stated, "the court *finds* that [defendants] are major participants and they are direct abettor and abettor [*sic*.]. They prevented the escape and prevented the person from defending themselves." (Italics added.) (See *People v. Garrison* (2021) 73 Cal.App.5th 735, 745 [a trial court is to act as an independent factfinder in determining beyond a reasonable doubt whether a defendant is guilty of murder under a still valid theory of murder].)

B.    *Failure to Reduce Defendants' First Degree Murder Convictions to Second Degree Murder*

Gomez contends the trial court erred in denying his petition without reducing his first degree murder conviction to second degree murder because the court did not find he satisfied the elements of deliberate and premeditated first degree murder. Gerson and Gonzalez join Gomez's contention. The court did not err.

1.    Standard of Review

We review the interpretation of a statute de novo. (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) In determining the "Legislature's intent so as to effectuate the law's purpose," we "begin by examining the statute's words, giving them a plain and commonsense meaning." (*Ibid.*, internal citations and quotation marks omitted.) "If the plain language of the statute is clear and unambiguous, our inquiry ends, and we need not embark on

20

judicial construction.  [Citations.]  If the statutory language contains no ambiguity, the Legislature is presumed to have meant what it said, and the plain meaning of the statute governs. [Citations.]"  (*People v. Johnson* (2002) 28 Cal.4th 240, 244.)

      2.      <u>Analysis</u>

Defendants do not argue the prosecution failed to meet its burden of proving they are guilty of murder beyond a reasonable doubt and thus the trial court erred in denying their petitions. Instead, they argue that even when the prosecution proves a defendant is guilty of murder beyond a reasonable doubt, section 1172.6 nevertheless requires a trial court to reduce a first degree murder conviction to second degree murder if it did not find the defendant committed the murder with deliberation and premeditation.  We disagree.  Section 1172.6's plain language does not contain a mechanism for a trial court to reduce a first degree murder conviction to second degree murder.

Under section 1172.6, if the prosecution meets its burden of proving beyond a reasonable doubt that a defendant "is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019," then the defendant is not entitled to relief and the trial court must deny the defendant's petition for resentencing.  (*Id.*, subd. (d)(3).)  If, however, "the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."  (*Ibid.*)  If the defendant is entitled to relief and the murder was charged generically, then

21

the "conviction shall be redesignated as the target offense or underlying felony for resentencing purposes." (*Id.*, subd. (e).)

Accordingly, under section 1172.6, a trial court has two options in adjudicating a resentencing petition: Deny the petition and leave in place the murder conviction or grant the petition and vacate the murder conviction and resentence the defendant on the remaining charges or target offense or underlying felony. Reducing a first degree murder conviction to second degree murder is not an option under section 1172.6.[15]

---

[15] Because we hold that section 1172.6 does not permit reducing a first degree murder conviction to second degree murder, we do not reach the Attorney General's contentions that defendants forfeited this issue or that the trial court found defendants acted with intent to kill as well as deliberation and premeditation.

## V.     DISPOSITION

The orders are affirmed.

KIM, J.

We concur:

RUBIN, P. J.

MOOR, J.